### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| CIGNA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 4:23-cv-00093 |
| | ) | |
| vs. | ) | |
| | ) | |
| AMY BRICKER and | ) | |
| CVS PHARMACY, INC, | ) | |
| | ) | |
| Defendants. | ) | |

### THIRD AMENDED COMPLAINT

Plaintiff, Cigna Corporation, by and through its attorneys, brings this Third Amended Complaint seeking injunctive relief and money damages as follows:

### INTRODUCTION

Plaintiff Cigna Corporation ("Cigna" or "Plaintiff") brings this action against Defendant Amy Bricker ("Bricker"), a former senior executive leader of Cigna's wholly owned subsidiary, Evernorth Health, Inc. d/b/a Evernorth Health Services ("Evernorth"). The agreement Bricker signed prohibits her from working for any Cigna competitor, an agreement Cigna reserves for only its most senior executive leaders. Cigna employs more than 70,000 people company-wide, but only 16 active employees are bound by this non-competition agreement. Bricker, as one of the top 15 highest paid employees, was one of those very select few top-level executives. Despite holding a high-level executive role, and despite being fully aware that she had signed the non-competition agreement, and despite accepting a huge increase in compensation and extensive equity participation in exchange for signing the agreement, Bricker recently resigned from her senior leadership position with Cigna to become a member of the Executive Leadership team at Cigna's chief competitor, Defendant CVS PHARMACY, INC. ("CVS"). This, of course, is a direct

violation of her contractual non-competition restrictions, and she is doing so in a role that would inevitably require her to use and disclose Cigna's confidential and trade secret business information for the benefit of her new employer.

In her role at Evernorth, Bricker reported directly to Evernorth's CEO and was privy to the business's most highly sensitive information relating to supply chain, product development plans, strategic direction, enterprise-wide initiatives, sales strategy, and client and health plan relationships. Bricker also had responsibility for preparing and contributing to Cigna's proposals to obtain business for which CVS was competing, including a successful pitch in October 2022 to secure the PBM business of Centene Corporation, a client previously serviced by CVS that represents 20 million consumers and billions of dollars in revenue. As a result of the successful bid, Cigna provided Bricker with a high six-figure spot bonus. If Bricker were to be permitted to accept her position with CVS, she would be responsible for developing products and services in direct competition with Evernorth and the broader Cigna enterprise.

Cigna will be immediately and irreparably harmed if Defendant Bricker is permitted to commence her new position with CVS. Accordingly, Cigna seeks temporary, preliminary, and permanent injunctive relief to hold Bricker to her contractual obligations and to prevent Defendants from misusing Cigna's trade secrets and confidential information. Cigna also seeks damages based on Bricker's conduct in violation of her legal obligations, and CVS's tortious interference with same. In support of the foregoing, Cigna asserts as follows:

## PARTIES

1.     Cigna Corporation is a corporation incorporated in the State of Delaware with headquarters and principal place of business at 900 Cottage Grove Road, Bloomfield, CT 06002.

2.     Bricker is an adult citizen and resident of Missouri. Bricker was employed by

Cigna's wholly owned subsidiary, Cigna Management Company, LLC in St. Louis, Missouri until she voluntarily resigned on January 9, 2023.  Her last day of employment with Cigna was February 3, 2023.  Cigna Management Company, LLC is the corporate entity that employs the highest-level enterprise leaders within Cigna.

3.      CVS Pharmacy, Inc. is a corporation incorporated in the State of Rhode Island with its principal place of business in Woonsocket, Rhode Island.

## JURISDICTION AND VENUE

4.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action includes claims arising under the laws of the United States, specifically, the U.S. Computer Fraud & Abuse Act ("CFAA"), 18 U.S.C. §1030, *et seq*. and the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, *et seq*. The Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. §1367 because the claims are so related to the CFAA and DTSA claims for which this Court has original jurisdiction that they form part of the same controversy.

5.      This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00.

6.      This Court has personal jurisdiction over Defendant Bricker because Bricker is a resident of the State of Missouri.

7.      This Court has personal jurisdiction over Defendant CVS because CVS transacts business and owns and/or possesses real estate in the State of Missouri.

3

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Plaintiff, through its wholly owned subsidiary Evernorth, is located this District, and the events giving rise to the claims in this action occurred in substantial part in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### *The Relationship Among Cigna, Evernorth, and Express Scripts*

9.     Cigna is a global health services conglomerate that works with employers and organizations around the world to develop innovative programs, help individuals and families improve their health, and lower medical costs.

10.     Through its Evernorth brand, Cigna sells a vast array of health services, including pharmacy benefit management, medical benefit management, care solutions, and data and analytics services.  Evernorth's pharmacy benefit manager, Express Scripts PBM, is the single largest business unit by revenue within both Evernorth and the broader Cigna enterprise.

11.     As a PBM, Express Scripts manages prescription drug benefits programs on behalf of employers, federal agencies, public sector entities, unions, health plans, including commercial Medicare, and Medicaid, the military, and wholesale entities, such as Amazon Pharmacy, by way of example.  Express Scripts offers a variety of services and programs to these various entities. The PBM industry is highly competitive, and there are many PBMs from which clients can choose to contract for PBM services.

12.     Express Scripts is able to offer lower-cost prescription drug benefits to clients in part because of the rebates it receives from drug manufacturers.  Express Scripts has devoted substantial resources to the development of its drug formularies, as well as its drug manufacturer rebate contracting process and considers the processes, considerations, analytics, negotiating strategies and other strategic tools to be highly confidential and closely protected trade secrets.

13.     Express Scripts' bid solicitations to drug manufacturers, the manufacturers' responses, Express Scripts' strategy (including considerations of and decisions on the bids), and Express Scripts' rebate agreements are highly confidential and competitive documents and trade secrets.  These include processes, as well as commercial and financial terms that Express Scripts diligently protects to maintain as confidential.

14.     Disclosure of this information to Express Scripts' competitors would harm Express Scripts commercially, because a significant part of Express Scripts' competitive advantage is its ability to provide its clients with superior economic value and cost savings; if Express Scripts' competitors had access to this information, they could use it to their advantage in their own negotiations with manufacturers in ways to undercut the agreements negotiated by Express Scripts.

15.      Express Scripts is part of the Evernorth family of companies, but Evernorth itself is more than a PBM business.  Evernorth directly impacts consumers by delivering innovative and flexible solutions for health plans, employers, and government programs through its component businesses, including Express Scripts, Accredo, eviCore, and MDLIVE.  These businesses, in addition to Express Scripts, include a specialty pharmaceutical and home infusion provider, a medical benefits management company, a telemedicine company, as well as behavioral health, musculoskeletal, primary home care, and direct health services, among other things.

16.     Evernorth represents Cigna's entire health services and solutions business. Since its launch in 2020, Evernorth has aspired and worked toward bringing together Cigna's vast array of health services capabilities in pharmacy solutions, benefits management, care solutions, and data and analytics to coordinate services and provide comprehensive solutions for its clients, customers, and patients.

**_Bricker Was A Senior Leader Who Obtained and Developed_**
**_Critical Enterprise-Wide Strategic and Competitively Sensitive Information_**

17.   Defendant Bricker joined Express Scripts in 2010 and held various leadership roles in pharmacy network management, supply chain economics, and supply chain product.

18.   Bricker has been a key thought leader and spokesperson involved in both the launch and strategic direction of Evernorth and its various components since Evernorth was first brought to market in September 2020.

19.   Indeed, after Cigna's acquisition of Express Scripts in 2018, Bricker was rapidly promoted from Senior Vice President, Supply Chain, to her current role as President of Express Scripts, effective December 21, 2020, at which time she received a very significant increase in compensation and benefits, nearly doubling her overall compensation opportunity, which was already in the seven-figure range.

20.   In her position as President of Express Scripts, Bricker was responsible for leading all aspects of Cigna's PBM business, including client relationships, supply chain, and drug procurement.   In addition, the Vice President of Evernorth Product Strategy reported to one of Bricker's direct reports, making Bricker ultimately responsible for understanding and coordinating product strategy not just within the PBM, but throughout Evernorth as a whole.

21.   Bricker also served as the most senior member of Evernorth's Senior Leadership Team, actively collaborating with Evernorth's other business teams, and guiding all aspects of Evernorth's strategic direction, financial performance, growth, and long-term vision.   In addition, Bricker attended a number of meetings with prospective clients in which PBM services were pitched alongside the health products developed and sold by Evernorth's care delivery business unit.

22.     Bricker was a highly visible and influential leader of the company.  Bricker regularly gave presentations, including to Cigna's Board of Directors, and made public appearances on behalf of the entire enterprise, including before investors and before Congress.

23.     As the President of Express Scripts and the most senior member of Evernorth's Senior Leadership Team, Bricker has, among other things:

    (a)     played a key leadership role in all of Cigna's client relationships across Evernorth, including several health plan relationships, in addition to the Cigna Health Plan;

    (b)     worked on strategy and assembly of care products and solutions, including product and solutions aimed at specific consumers;

    (c)     had visibility into the financial results and strategic direction of Cigna Healthcare;

    (d)     taken on several enterprise-wide initiatives, cutting across both Evernorth and Cigna's Healthcare lines of business.

24.     Bricker has been immersed in, and obtained intimate knowledge of, Evernorth's and Cigna's confidential business information at the highest level.

25.     As such, the information to which Bricker was privy was not limited to PBM—it included all aspects of Evernorth's business.  This includes information relating to Evernorth's plans for product development and innovation, as well as supply chain information, financial performance of various business units, business projections and strategic plans, renewal pipelines, new business opportunities, expense reduction strategies, personnel management information, clinical approaches, the structure of client partnerships, the combination of ancillary products and services offered by Evernorth, the structure of account management teams, and the methodology

and strategies employed by Cigna with respect to network contracting, earnings, profitability, and portfolio management.

26.    By virtue of her leadership position, Bricker participated in or led a number of initiatives that spanned Evernorth and/or the broader Cigna enterprise, including:

(a)    Serving as a member of the Total Cost of Care (TCC) Executive Committee, the work of which related to affordability in the context of Cigna Healthcare;

(b)    Leading the Cigna Patient Assurance Program;

(c)    Leading the Cigna enterprise response to *Dobbs v. Jackson Women's Health Organization* and associated impact on pharmacy and medical benefits; and

(d)    Representing Cigna in proceedings with the Federal Trade Commission and Cigna's COVID-19 response client initiative.

27.    Bricker obtained confidential information through data circulated to her in her role as President of Express Scripts, as well as through regular meetings with Evernorth's business leaders.

28.    Specifically, Bricker participated in a collaborative Evernorth leadership team that has convened weekly for Senior Leadership Team meetings with the CEO of Evernorth, monthly to discuss Evernorth's financials across business units, in-person for a full day once a month, and quarterly for extended meetings, including relating to core business reviews across Evernorth businesses, and as needed to review key strategic information and drive decisions regarding Evernorth's suite of products and services.

29.    Bricker's role for Cigna was not only in an internal management capacity.  Her role was also client-facing, as she was the face of the business and the key point of contact for numerous

clients.  Bricker regularly interacted and communicated with Cigna's clients and served as an escalation point for many key client relationships.

30.     By way of example, Bricker served as the face of Evernorth at a 2022 conference it hosted for clients, referred to as Outcomes +.  As part of her formal remarks, Bricker emphasized the interconnectivity of Evernorth's various business units, stating, "If we're going to reshape healthcare, we must partner together. It's why we brought all these best-in-class capabilities like, MDLIVE, Express Scripts, eviCore, and Accredo together as 'Evernorth.'"

31.     Bricker also presented at Cigna's Investor Day 2022 enterprise-wide presentation to investors.  Bricker was one of only seven speakers at the presentation, together with Cigna's CEO and CFO.

32.     In addition, with Cigna's support, Bricker assumed a position on the Pharmaceutical Care Management Association (PCMA) that was previously held by the Evernorth CEO.

33.     Bricker also spoke on behalf of Cigna before Congress, testifying to the House Committee on Energy and Commerce Subcommittee on Health in May 2019.  During that testimony, Bricker noted her various "leadership roles in pharmacy network management, supply chain economics, and retail contracting strategy" at Express Scripts.  She also noted that she was "responsible for key relationships and strategic initiatives across the pharmaceutical supply chain" and that her team had "responsibility for developing value-based contracts to improve affordability, access, and care  …."  *See* A. Bricker May 9, 2019, Testimony Before the House Committee on Energy and Commerce Subcommittee on Health, attached hereto as **Exhibit A**.

34.     During her testimony, Bricker also highlighted Cigna's cross-enterprise collaborative efforts to accelerate value-based care for patients through, for example, Cigna's

efforts to deliver "[r]eal-time clinical alerts that reach physicians through electronic prescribing systems that turn data into actionable patient intelligence, helping people stay on their therapy regimen and avoid dangerous drug-drug interactions." *Id.*

35.     Bricker was given the responsibility for speaking on behalf of Cigna due to the magnitude of her role within Cigna: she was in the top tier of management, among only a select group that had access to the most sensitive and valuable information at Cigna, across business lines, and not limited to PBM.

36.     Bricker was also a key contact for Cigna's external consultants, with whom she worked closely, including during the request for proposal ("RFP") process for winning and retaining business.

37.     Bricker was a champion for collaboration and connecting coordinated services across Evernorth's business portfolio to provide better service and to facilitate coordination of care management and care delivery solutions. Indeed, she collaborated in the development of coordinated offerings among business units for purposes of multiple RFPs.

38.     Bricker was a member of the Evernorth pricing committee, which assembled to review and approve the terms offered on all of Evernorth's major RFPs. Bricker was the highest-ranking member of the committee, in that Evernorth's CEO was not a member.  As part of this committee, Bricker had visibility into all offers Evernorth would make.  This included visibility into the economics of other parts of the Evernorth business, in addition to PBM.  Bricker was involved, for example, in steering budget allocation decisions across Evernorth's businesses, providing input regarding the allocation of funds not only with respect to Express Scripts, but also among the entire family of Evernorth companies.

***Bricker Received Lucrative Stock Grants in***
***Exchange for Entering Restrictive Covenants***

39.     In connection with her employment and her professional advancement with Cigna, beginning in 2019, following Cigna's acquisition of Express Scripts in late 2018, Bricker was provided with the opportunity to participate in various equity plans with Cigna, through which Cigna granted her the option to purchase certain numbers of shares of Cigna Common Stock pursuant to specified terms and conditions.

40.     As a condition of participating in each of these plans, year over year Bricker agreed to abide by a series of post-employment restrictive covenants designed to protect Cigna's confidential business information, goodwill, and relationships with its customers, providers, and key employees.

41.     Most recently, in 2022, Bricker received grants and entered into the 2022 Restricted Stock Grant Agreement, attached hereto as **Exhibit B**, the 2022 Nonqualified Stock Option Grant Agreement, attached hereto as **Exhibit C**, and the 2022 Strategic Performance Share Grant Agreement, attached hereto as **Exhibit D**.

42.     In addition to the foregoing agreements entered into by Bricker, Bricker also participated in Cigna's Restricted Stock Grant plan, Cigna's Nonqualified Stock Option Grant plan, and Cigna's Strategic Share Grant plan in 2019, 2020 and 2021.  Copies of these agreements are attached hereto as **Exhibits E** through **M**.

43.     Beginning in 2020, each of these agreements conditioned the grants upon Bricker's acceptance of, and compliance with, restrictive covenants contained in a separate agreement.  *See* Exhs. B, C, E, F, H and I, at par. 7(a)(2); and Exh. D, G, and J at par. 8(a)(2).

44.     In that agreement, Cigna's Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Covenant Agreement"), which Bricker signed in each year beginning in 2020,

11

Bricker agreed to certain restrictive covenant obligations, which included the following non-competition restriction:

> (a)     Employee agrees that during the Restricted Period and in any Restricted Area, Employee shall not, directly or indirectly by assisting, **provide services to a Competitor of the Company.** Employee's agreement not to provide such services to a Competitor applies regardless of whether Employee does so as an employee, owner, partner, principal, advisor, independent contractor, consultant, agent, officer, director, investor, or shareholder. Notwithstanding the foregoing, Employee's ownership of less than 1% of the outstanding shares of a publicly traded company that constitutes a Competitor shall not be deemed to be providing services to such Competitor solely by virtue of owning such shares.
>
> (b)     Employee agrees that during the Restricted Period, Employee shall not, directly or indirectly, work on a Company account on behalf of a Customer or Business Partner or serve as the representative of a Business Partner or Customer for such Business Partner's or Customer's relationship with the Company.

*See* Bricker's 2022 Covenant Agreement, attached hereto as **Exhibit N**, at Sec. 1.3 (emphasis added).

45.     The post-employment Restricted Period is the two-year period immediately following the termination of Bricker's employment, and the scope of the restriction is throughout the United States.  Specifically, the Restricted Area is defined to include:

> (a)     those states, districts and territories of the United States in which the Company conducts its business;
>
> (b)     any other countries in which the Company conducts its business.

*Id.* at Sec. 1.9.

46.     Bricker is one of fewer than 20 employees across the Cigna enterprise, out of over 70,000 company-wide, who are required to enter into to this version of the Covenant Agreement, including the two-year non-competition restriction that prohibits Bricker from directly or indirectly providing services to a competitor of the Company.

47.     As an E3 level employee of Cigna, Bricker is one of less than five individuals under Cigna Corporation's CEO's direct reports with the prominence, business value, and enterprise leadership levels to justify her inclusion among this select group.

48.     In addition to the non-competition restrictions, Bricker also agreed to confidentiality, non-disclosure, non-use obligations, contained in Section 1.1 of the 2022 Covenant Agreement, Exh. N.

49.     Bricker also agreed that Cigna would be irreparably harmed if she breached, or threatened to breach, her non-competition obligations.  *Id.* at Sec. 1.6.

50.     The restrictions to which Bricker agreed are reasonable and necessary to protect Cigna's legitimate interests, including (a) trade secrets; (b) valuable confidential business information that otherwise does not qualify as trade secrets; (c) substantial relationships with Cigna's customers, business partners, and/or employees; and (d) goodwill.

### *Bricker Rejects Enterprise Leadership Team Role at Cigna and Instead Resigns to Take a National Leadership Role with CVS Health/Aetna—Cigna's Largest Competitor*

51.     Bricker, who was already on Cigna's Senior Leadership Team, was advised in the Fall of 2022 and officially in January 2023 that she would be offered a position on Cigna's Executive Leadership Team, together with Evernorth's CEO, the CEO of Cigna Corporation, and the other highest-level executives across the enterprise.  This role would have further expanded Bricker's formal responsibilities and accountabilities within the Evernorth business.

52.     This followed a natural progression in the preceding years, during which Bricker was groomed for one of the very top corporate executive positions at Cigna, having been given expansive responsibilities that included guiding spending allocation and strategic direction within Evernorth, direct participation in meetings with Cigna's Board of Directors, responsibility for public-facing representation of Cigna on an enterprise-wide basis to employees, customers, and

investors, and responsibility for representing Cigna in testimony before Congress, among other things.

53.    Bricker declined the offer to join Cigna's Executive Leadership Team, opting instead to work for Cigna's direct competitor, CVS, on its Executive Leadership Team.

54.    Specifically, on January 10, 2023, Bricker provided Cigna with notice of her resignation.  She advised that she would be joining CVS as its Chief Product Officer, Consumer Health.

55.    According to CVS's job description, a copy of which is attached as **Exhibit O**, in this role Bricker would report directly to CVS's Chief Executive Officer and lead a newly formed product strategy and innovation function for consumer health products at CVS Health/Aetna.

56.    Bricker's role at CVS includes responsibility for development of an enterprise product strategy and plans for consumers in the Aetna, retail (pharmacy), and health care delivery businesses.  Bricker's job description explains that she will collaborate across business units, including all facets of CVS's business that compete with Cigna's Evernorth business.

57.    CVS meets the definition of a Competitor as defined in the restrictive covenants that Bricker entered into with Cigna, and she is joining CVS within the restricted period defined in her restrictive covenants.  Indeed, it is hard to imagine a more clear and direct competitor of Cigna than CVS.

58.    Accordingly, Bricker's prospective employment with CVS constitutes a per se violation of the non-compete restrictions in multiple agreements she signed with Cigna, which strictly prohibit her from working for a competitor, regardless of the nature of her role.

59.    Not only does Bricker's planned role for CVS constitute a per se violation of her contractual obligations, requiring no further analysis, but even if a role-specific analysis were

required (which it is not, pursuant to the plain terms of Bricker's agreement with Cigna), Bricker's

proposed role with CVS would still be competitive and would constitute a violation of her

contractual obligations.

60.     Indeed, Bricker's planned role with CVS will require her to perform many of the

same functions that she has been performing in her role as President, Express Scripts.

61.     CVS's job description for Chief Product Officer, Consumer Health provides that

the individual holding this position would be responsible to:

> Develop enterprise product strategy and plans for consumers in the
> Aetna, retail and health care delivery businesses with cross-cutting
> capabilities that optimize their health and experiences. Launch go-
> to-market product strategies that enable growth by enhancing
> service to those customers.
>
> -   Enterprise Integrated Product Innovation, Design and
>     Development to serve consumers in the Aetna, retail and health
>     care delivery businesses.
>
> -   External Partnership Management in the Aetna, retail and health
>     care deliver businesses.
>
> -   Product Center of Excellence for Aetna, retail and health care
>     delivery businesses.
>
> -   Product Portfolio Management for financial performance,
>     profitability and expansion of services consumers in the Aetna,
>     retail and health care delivery businesses.
>
> -   Product Insights related to expanding services to consumers in
>     the Aetna, retail and health care delivery businesses.
>
> -   Product Marketing for consumers in the Aetna, retail and health
>     care delivery businesses.

*See* Exh. O.  Performance of these duties violates Bricker's ongoing contractual obligations owed

to Cigna because this description precisely describes a function that Bricker has been performing

during the past two years, and also incorporates elements of her responsibilities for Express Scripts, even prior to the launch of Evernorth.

62.     CVS's offer of employment to Bricker follows closely on the heels of Cigna's victory in securing a PBM contract with Centene, one of the largest Medicaid managed care organizations in the United States.

63.     Cigna won the Centene contract following a competitive bidding process. Before Cigna secured Centene's business, Centene's PBM contract was managed by CVS. CVS subsequently announced that the loss of Centene's PBM contract, combined with another recent event, would create a $2 billion decline in 2024 revenue.

64.     Upon information and belief, Centene has approximately twenty million members, who spend tens of billions of dollars annually on prescription drugs. Centene will be Express Scripts' largest single client.

65.     Bricker, as President of Express Scripts for Cigna, was instrumental in developing the competitive bid that Cigna presented to Centene, and Cigna awarded her a high six-figure spot bonus as a result of her contribution.

66.     Upon information and belief, CVS's offer to Bricker represents a desperate effort by CVS to retaliate for the loss of this business by poaching Cigna's leader in developing competitive bids for its Evernorth division—who also managed the most lucrative unit of Evernorth, and who is most knowledgeable about the strategy employed by Cigna in its bid to Centene, as well as the strategies employed in other competitive bids for PBM services and Evernorth's business as a whole—in order to benefit from Bricker's knowledge of Cigna's competitive bidding strategies to use them to attempt to reclaim CVS's market share and to competitively harm Evernorth's business through unfairly competitive means.  At the time of her

resignation, Bricker disclosed that she was contacted by CVS in the context of their effort to hire a successor for the current Chief Executive Officer.

67.     Bricker's proposed role at CVS would not only breach her contractual obligations to Cigna.  Based on the vast scope of Bricker's role, responsibilities, and access to information, as a result of the work she engaged in with her peers at Evernorth, her knowledge of Cigna's enterprise-wide confidential, sensitive and proprietary information is deep and unquestionable. The proposed role that Bricker accepted, and any role on CVS's executive leadership team, would create a situation where disclosure of Cigna's confidential and trade secret information is inevitable and unavoidable.

68.     Sitting at the table with CVS's CEO and other members of its Executive Leadership Team, Bricker could not divorce from her mind the information she has gleaned as one of the most senior leaders in the entire Cigna organization.  It is impossible to imagine, for example, that she could hold a position in which she is responsible for development of product strategy and plans without considering her knowledge of the product development and strategic direction of one of CVS's primary competitors.   Nor could she collaborate across CVS's health care benefits, delivery, and retail businesses – as specified in her job description – without relying on her knowledge of how Evernorth combines ancillary products and services, or the methodology and strategies employed by Cigna with respect to network contracting, earnings, profitability, or portfolio management.  Bricker's knowledge of Evernorth's supply chain—how it is allocating funds and resources across its businesses, its business projections, expense reduction strategies, clinical approaches, and the structure of its client partnerships—would all be incalculably beneficial to a direct competitor, and inevitably part of Bricker's decision-making process as a member of the Executive Leadership Team for CVS.

69. On January 13, 2023, Cigna's counsel corresponded with CVS's counsel regarding Bricker's resignation and prospective employment with CVS. Cigna advised CVS of Bricker's contractual obligations and how those obligations would be breached if CVS hired Bricker. Counsel for Cigna and CVS thereafter engaged in efforts to resolve the dispute, but negotiations reached an impasse on January 23, 2023, when CVS issued a press release publicly announcing that Bricker had been hired into the position it had offered to her.

### *Bricker Engages In Suspicious and Concerning Conduct, Including Destroying Data On Her Company-Issued Cellular Device*

70. On January 9, 2023, the day she tendered notice of her resignation, Cigna cut off Bricker's access to its network and data, and asked Bricker not to return to the office, but to make herself available as needed for transition purposes.

71. On January 13, 2023, Cigna made arrangements with Bricker to collect her company-issued devices prior to her last day of employment.

72. On January 24, 2023, Cigna security personnel went to Bricker's home to collect her company-issued iPhone. Bricker appeared surprised about having to turn in her phone and told the Cigna security officer that she needed to get some numbers off the phone before handing it in.

73. Bricker subsequently returned the phone to the security personnel.

74. Upon receiving Bricker's iPhone, Cigna's information technology specialists noticed that the phone had undergone a factory reset.

75. Cigna conducted an investigation, which included a third-party forensic analysis of the phone, and confirmed that the phone had been reset, effectively deleting all data on the phone.

76. Upon information and belief, Bricker intentionally and knowingly performed a factory reset on the phone prior to turning it in, in an effort to delete all data on the phone, which included Cigna's confidential business information and evidence related to this matter. Bricker's

destruction of this information and evidence was deliberate, willful, knowing, and performed without authorization or permission from Cigna.

77.     Upon information and belief, Bricker is responsible for the deletion of Cigna's confidential information, which was not authorized and was conducted by Bricker in secret.

### *The Threat Of Irreparable And Immediate Harm*
### *Cigna Faces From Bricker's Conduct*

78.     Bricker's course of conduct violates the covenants that she entered into with Cigna in exchange for lucrative equity participation opportunities, including but not limited to her covenants not to compete for two years following the termination of her employment.

79.     Bricker repeatedly agreed through multiple restrictive covenant agreements that if she breached her ongoing obligation not to compete with Cigna, that Cigna would be irreparably harmed.

80.     Bricker's conduct in planning to commence employment threatens Cigna with immediate irreparable harm, and will continue to irreparably harm Cigna if such conduct is not enjoined immediately.  Cigna will suffer damage that is incalculable, by the actual and threatened loss of business, clients, employees, and confidential information caused by Bricker's employment in a competitive position with a direct competitor in violation of her contractual obligations.

81.     The issuance of injunctive relief is necessary to protect Cigna's legitimate business interests and to preserve the integrity of restrictive covenant agreements entered into with employees such as Bricker, whereas denial of injunctive relief will leave Cigna vulnerable to the same or similar conduct from other employees.

### *Bricker's Stock Repayment Obligations*

82.     By executing the Restricted Stock Grant Agreements discussed above, Bricker further agreed that if she competed against Cigna, solicited or hired Cigna employees, solicited

Cigna customers, or disclosed Cigna's confidential information, she would immediately pay to Cigna the value she realized from any shares that vested during the 12-month period preceding the date of any such violation.  *See* Exhs. B, E, H and K, at paragraph 8(b)-(c).  The payment equals the number of shares that vest during that 12-month period multiplied by the fair market value of those shares on their vesting date plus the total amount of all dividends, if any, paid to Bricker on those shares through the date of payment.  *Id.* at paragraph 8(c).  Bricker's Restricted Stock Grant Agreements provide that Cigna would send Bricker written notice and demand for payment and Bricker agreed to remit payment within 30 days of written notice.  *Id.* at paragraph 8(d)(3).

83.     Pursuant to Bricker's 2019 Restricted Stock Grant Agreement, based on the total number of shares and share price for shares that vested during the applicable period, the total value of such shares was $74,323.

84.     Pursuant to Bricker's 2020 Restricted Stock Grant Agreement, based on the total number of shares and share price for shares that vested during the applicable period, the total value of such shares was $111,699.

85.     Pursuant to Bricker's 2021 Restricted Stock Grant Agreement, based on the total number of shares and share price for shares that vested during the applicable period, the total value of such shares was $168,576.

86.     By executing the Nonqualified Stock Option Grant Agreements discussed above, Bricker agreed that if she competed against Cigna, solicited or hired Cigna employees, solicited Cigna customers, or disclosed Cigna's confidential information, she would immediately make a payment to Cigna based on that part of the option that she exercised within the 24-month period preceding the date of any such violation.  *See* Exhs. C, F, I, and L at paragraph 8(b)-(c).  The payment equals the number of shares she acquired when she exercised the option multiplied by

the excess of (a) the fair market value on the date she exercised the option over (b) the option price, plus the total amount of all dividends, if any, paid on those shares through the date of payment. *Id.* at paragraph 8(c).  Bricker's Nonqualified Stock Option Grant Agreements provide that Cigna would send Bricker written notice and demand for payment and Bricker agreed to remit payment within 30 days of written notice.  *Id.* at paragraph 8(d)(3).

87.     Pursuant to Bricker's 2019 Nonqualified Stock Option Grant Agreement, based on the number of options granted, exercised, and sold during the applicable period, the total gain on options exercised by Bricker was $360,910.

88.     Pursuant to Bricker's 2020 Nonqualified Stock Option Grant Agreement, based on the number of options granted, exercised, and sold during the applicable period, the total gain on options exercised by Bricker was $351,492.

89.     Pursuant to Bricker's 2021 Nonqualified Stock Option Grant Agreement, based on the number of options granted, exercised, and sold during the applicable period, the total gain on options exercised by Bricker was $265,438.

90.     By executing the Strategic Performance Share Grant Agreements discussed above, Bricker agreed that if she competed against Cigna, solicited or hired Cigna employees, solicited Cigna customers, or disclosed Cigna's confidential information, she would immediately make a payment to Cigna based on the value she realized from any Performance Shares during the 12-month period prior to the date of termination.  *See* Exhs. D, G, H, and M, at paragraph 9(b)-(c). The payment equals the number of performance shares paid during the applicable period, multiplied by the fair market value of the shares issued on the payment date, plus the total amount of all dividends paid on those shares through the date of payment.  *Id.* at paragraph 9(c).  Bricker's Strategic Performance Share Grant Agreements provide that Cigna would send Bricker written

notice and demand for payment and Bricker agreed to remit payment within 30 days of written notice.  *Id.* at paragraph 9(d)(3).

91.     Pursuant to Bricker's 2019 Strategic Performance Share Grant Agreement, based on the total number of shares and share price for shares issued during the applicable period, plus dividends, the total value of such shares was $223,440.

92.     Pursuant to paragraph 8(d)(3) of Bricker's Restricted Stock Grant Agreements, paragraph 8(d)(3) of Bricker's Nonqualified Stock Option Grant Agreements, and paragraph 9(d)(3) of Bricker's Strategic Performance Share Grant Agreements, Cigna sent written demand for repayment to Bricker due to her violation of her contractual obligations.  *See* Correspondence dated January 26, 2023, attached hereto as **Exhibit P**.

**COUNT I**
**BREACH OF CONTRACT**
**(Against Bricker)**

93.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

94.     By virtue of Bricker accepting a position with a competitor in violation of her non-competition obligations noted above, Bricker has breached -- or absent injunctive restraints imminently will breach -- the terms of the restrictive covenants she agreed to in multiple contracts with Cigna, which are attached as Exhs. B-M.

95.     Upon information and belief, Bricker has further breached her contractual obligations as she does not intend to pay the $1,555,879 that she owes to Cigna pursuant to the 2020, 2021 and 2022 Restricted Stock Grant Agreements and the 2020, 2021 and 2022 Restricted Stock Grant Agreements.

96.     Upon information and belief, and as Cigna expects to establish upon further investigation and discovery, absent judicial intervention in the form of an injunction, Bricker will be in violation of, and will continue to violate, her contractual obligations.

97.     As a consequence of the foregoing, Cigna faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF**
**THE MISSOURI UNIFORM TRADE SECRETS ACT (MUTSA)**
**(Against Defendants)**

98.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

99.     Cigna possesses certain trade secrets and confidential information with which Bricker is familiar, and which Bricker has a duty not to disclose or use outside of Cigna.

100.    The information as described above derives independent economic value, actual and potential, from not being generally known, and specifically from not being known to competitors of Cigna who could profit from its use or disclosure.

101.    Nor is the above-described information readily ascertainable by Cigna's competitors or other persons by proper means.

102.    Cigna has taken reasonable and adequate measures under the circumstances to maintain the secrecy of its confidential business information and trade secrets, including by requiring high level and experienced personnel such as Bricker to abide by the terms of the agreements described herein, as well as by implementing data security measures.

103.    Bricker's potential employment in the position described by CVS will result in the inevitable disclosure of the confidential information and trade secrets of Cigna.  Such disclosure

will benefit Bricker and CVS, and violates the Missouri Uniform Trade Secrets Act, R.S. Mo. 417.450, *et seq*.

104.     Bricker's decision to proceed with this position constitutes a willful disregard of Cigna's trade secret rights.  By the very nature of the duties of Bricker's new position at CVS, it is impossible that she would not use or disclose her knowledge of Cigna's trade secrets to the detriment of Cigna.  As such, the decision to proceed with this position constitutes a threatened misappropriation of trade secrets.

105.     Bricker's conduct in proceeding with this position, and ignoring the concerns and demands expressed by Cigna, constitutes willful and malicious misappropriation.

106.     As a consequence of the foregoing, Cigna faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

**COUNT III**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF**
**DEFEND TRADE SECRETS ACT**
**(Against Defendants)**

107.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

108.     Cigna possesses certain trade secrets and confidential information with which Bricker is familiar, and which Bricker has a duty not to disclose or use, including on behalf of a competitor such as CVS.

109.     The information as described above derives independent economic value, actual and potential, from not being generally known, and specifically from not being known to competitors of Cigna who could profit from its use or disclosure.

110.     Nor is the above-described information readily ascertainable by Cigna's competitors or other persons by proper means.

111.    Cigna's trade secrets provide it with an advantage over its competitors.

112.    Cigna has expended significant resources in developing its trade secrets for its exclusive benefit.

113.    Cigna has taken reasonable steps to protect its trade secrets from disclosure, including by requiring high level and experienced executives such as Bricker to abide by the terms of the agreements described herein, as well as by implementing data security measures.

114.    Bricker gained access to and knowledge of these trade secrets by virtue of her employment with Cigna.

115.    Bricker's employment with CVS threatens disclosure and/or use of the confidential information and trade secrets of Cigna.  Such disclosure will benefit Bricker and CVS, and violates not only Bricker's agreements with Cigna, but also the DTSA, 18 U.S.C. § 1831, *et seq*.

116.    Disclosure and/or use of Cigna's trade secrets to a direct competitor such as CVS would be willful and malicious.

117.    As a consequence of the foregoing, Cigna faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against CVS)

118.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

119.    As detailed above, Bricker is subject to a number of valid and enforceable post-employment restrictive covenants, including non-compete restrictions, with Cigna.

120.    Defendant CVS has knowledge of Bricker's contractual obligations, having discussed the same with Cigna's counsel on multiple occasions.

121.    Despite knowledge of Bricker's contractual obligations to Cigna, CVS aided and induced Bricker to breach her non-competition restrictions by hiring Bricker in violation of her covenants.

122.    CVS has no privilege or justification for its interference in Cigna's contractual rights with its former employees.

123.    As a consequence of the foregoing, Cigna faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

**COUNT V**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, *et seq.***
**(Against Bricker)**

124.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

125.    Plaintiff brings this action under 18 U.S.C. § 1030(g) allowing any injured person to maintain a civil action against the violator of 18 U.S.C. § 1030.

126.    The company-issued cell phone device described in this Complaint is a "protected computer" within the meaning of CFAA because it was used in or affecting interstate or foreign commerce or communication and it was an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, or a data storage facility or communications facility directly related to or operating in conjunction with such device.

127.    Cigna did not authorize Bricker to damage or destroy Bricker's company-issued cell phone or any information or data contained on this device.

128.    Bricker did not ask for or receive authorization from Cigna to delete any information or data contained on this device, nor did she share with anyone at Cigna that she was going to or had deleted information or data contained on this device.

129.    Cigna had advised Bricker that her proposed employment with CVS violated her contractual obligations to Cigna and Bricker therefore knew or should have known that litigation was imminent.  Bricker was also represented by counsel at this time. As a result, Bricker knew or should have known that she had a duty to preserve evidence potentially relevant to litigation, including data and information on her company-issued cell phone.

130.    Nonetheless, after Bricker resigned from Cigna to work for and serve CVS, upon information and belief, Bricker knowingly transmitted a code or command to wipe her company-issued cell phone, a 'protected computer' which belonged to Cigna, thereby causing damage to and destruction of the data thereon without the authorization of Cigna.

131.    Upon information and belief, and as Cigna expects to establish upon further investigation and discovery, Bricker's actions have impaired the integrity and availability of Cigna's data or information.

132.    The Cigna information and data wrongfully wiped and deleted by Bricker resided on a "protected computer." This "protected computer" was used in interstate commerce and communications, and it was a portal to and used to access the internet or other means of interstate commerce and communications such as cell phone carrier networks.

133.    By engaging in the foregoing conduct, Defendant Bricker violated CFAA §1030(a)(5)(A), which states: "Whoever knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage

without authorization, to a protected computer shall be punished as provided in subsection (c) of this section."

134.    As a result, Bricker caused Cigna damages and loss to Cigna's computers in excess of $5,000.  This loss includes, but is not limited to, the cost to Cigna of responding to Bricker's violation described above, which consisted of her wiping and deleting all of the information on her company-issued, "protected computer"; the value of employee time to investigate Bricker's conduct; the costs of a third-party forensic company to investigate Bricker's conduct; a damage assessment; the attempted restoration and recovery of unavailable data and electronically stored information that resided on Cigna's "protected computer" to the condition it was in prior to Bricker's violations; and the ongoing investigation of Cigna's "protected computer" and related systems following Bricker's violation, which caused the impairment and unavailability of the information and data that is alleged above.

135.    As a consequence of the foregoing, Cigna has suffered and will continue to suffer irreparable harm, loss and damage, the latter of which includes, but is not limited to, the impairment to the integrity and availability of data and electronically stored information which belonged to Cigna and resided on its computer, as alleged above, as well as other business damages, in an amount to be determined at trial, which damages are ongoing and continue unabated at the time of the filing of this Complaint.

<u>**COUNT VI**</u>
<u>**COMMON LAW UNFAIR COMPETITION**</u>
**(Against Defendants)**

136.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

137.    Defendants' actions as specified above, including Bricker's contractual breaches and threatened misappropriation of Plaintiff's trade secrets, constitute unfair competition with Plaintiff by reason of Defendants' use and disclosure thereof.

138.    As a direct and proximate result of Defendants' actions, Plaintiff has been damaged and will continue to be damaged.

139.    Defendants' conduct was willful, intentional and outrageous, evidencing evil motive or reckless indifference to the rights of others.

## COUNT VII
## UNJUST ENRICHMENT
### (Against Bricker)

140.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

141.    Upon information and belief Bricker does not intend to make payment of the $1,555,879 she owes pursuant to the 2019, 2020, 2021, and 2022 Restricted Stock Grant Agreements, the 2019, 2020, 2021, and 2022 Nonqualified Stock Option Grant Agreements, and the 2019-2022 Strategic Performance Share Grant Agreements.

142.    By violating her contractual obligations and refusing to pay Cigna, Bricker has been unjustly enriched by retaining $1,555,879, which she is not entitled to keep.

143.    As a result of Bricker's actions, Cigna has suffered and will continue to suffer financial injury and harm to its detriment, and to the benefit and gain of Bricker, in the amount of $1,555,879.

**COUNT VIII**
**CONVERSION**
**(Against Bricker)**

144.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

145.    Upon information and belief Bricker does not intend to make payment of the $1,555,879 she owes pursuant to the 2019, 2020, 2021, and 2022 Restricted Stock Grant Agreements, the 2019, 2020, 2021, and 2022 Nonqualified Stock Option Grant Agreements, and the 2019-2022 Strategic Performance Share Grant Agreements.

146.    By violating her contractual obligations and refusing to pay Cigna, Bricker has unlawfully exercised dominion and control over $1,555,879.

147.    As a result of Bricker's conversion, Cigna has suffered damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, by virtue of the foregoing acts and conduct complained of above, Plaintiff Cigna Corporation demands the following relief:

A.    Temporary, preliminary and permanent injunctive relief against Defendants Bricker and CVS for a period of twenty-four (24) months from the date of Defendant Bricker's termination of employment with Cigna prohibiting Bricker from, directly or indirectly, and whether alone or in concert with others, doing any of the following:

(1) Providing any services to, or for, CVS, or any other business or entity that is engaged in a business similar to, or that competes with, the business of Cigna, including specifically that Defendant Bricker shall not accept the position of CVS's Chief Product Officer, Consumer Health;

30

(2) Providing services to, or for, CVS, or any other business or entity that competes with the business of Cigna, that will likely result in the disclosure of Cigna's confidential information to such business or use Cigna's confidential information on behalf of such business, including specifically that Defendant Bricker shall not accept the position of CVS's Chief Product Officer, Consumer Health;

B.      Compensatory damages in an amount to be proven at trial;

C.      An award of exemplary damages as permitted by law;

D.      Costs and disbursements of this action, including reasonable attorneys' fees and expenses; as well as costs, damages, and computer forensic and related investigation fees pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*; and

E.      Such other and further relief as the Court may deem equitable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues so triable.

Dated: February 9, 2023                    Respectfully submitted,

**HUSCH BLACKWELL LLP**

By:     */s/ Randy Thompson*
        Randall Thompson (45581MO)
        Scott Meyers (68266MO)
        Elisa Sullivan (74858MO)
        190 Carondelet Plaza, Suite 600
        St. Louis, MO 63105
        Phone:  314.345.6453
        Email: randall.thompson@huschblackwell.com
               scott.meyers@huschblackwell.com
               eli.sullivan@huschblackwell.com

31